**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**HAMMOND DIVISION AT LAFAYETTE**

| | |
|---|---|
| JUSTIN W. HEDDEN, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Cause No. 4:22-cv-24 |
| ) | |
| TOLEDO PEORIA & WESTERN ) | |
| RAILWAY, CORP. AND GENESEE & ) | |
| WYOMING RAILROAD SERVICES, ) | |
| INC., ) | |
| ) | |
| Defendants. ) | |

**OPINION AND ORDER**

Plaintiff Justin W. Hedden brought suit against Toledo Peoria & Western

Railway, Corp. and its corporate parent Genessee & Wyoming Railroad Services, Inc.

for injuries he sustained while working on the railroad. Unsurprisingly, his claims are

brought under the Federal Employer's Liability Act ("FELA"). Defendants now seek

summary judgment and also an order excluding the opinions of Hedden's expert, John

David Engle. There are several problems with Engle's proposed testimony so, for

reasons outlined below, much of it will be excluded.  But because there are genuine

issues of material fact, Defendants' Motion for Summary Judgment [DE 56] will be

denied.

**Background**

Early in the morning on September 1, 2021, Justin Hedden was on-duty as a

conductor for Toledo Peoria & Western Railway Corp. ("TPW") at a railyard in

1

Lafayette, Indiana. [DE 60-11, ¶ 1.] Genessee & Wyoming Railroad Services, Inc. ("GW") owned and operated TPW at the time. For reasons that are not at all clear to me at this time, Hedden has sued both GW and TPW. In all events, on the morning in question, Hedden was "building a train" in the railyard along with the train's engineer, Lorenzo Cardine. *Id.* at ¶¶ 1-2. In broad strokes, building a train involves assembling various railcars in the railyard, literally "building" a chain of railcars.

When they were nearly done building the train, Hedden put the end-of-train device on the final railcar and attempted to release its hand brake. *Id.* at ¶ 3. But he couldn't release it. So he used a device known as a "brake stick" to release the brake. *Id.* at ¶ 4. A brake stick is a long pole with a hooked edge used to hook and turn the hand brake wheels on railcars to apply or release them. *See id.* at ¶¶ 4-5. Hedden placed the brake stick at roughly the 10 o'clock position on the brake-release handwheel and pulled. *Id.* at ¶ 4. The brake did not release, so, in an effort to get more leverage, he changed the brake stick to the 9 o'clock position and pulled again. *Id.* During the second pull, the brake stick slipped out of the hand brake wheel, causing him to lose his balance and fall against an adjacent stationary railcar ("the Incident"). *Id.* at ¶ 5. The fall resulted in immediate pain, and it was later determined that Hedden had suffered labrum tears to both shoulders. *Id.*

Cardine was in the locomotive and did not see the Incident, but Hedden informed him about it via radio. *Id.* at ¶ 6. Hedden also called a trainmaster and told him that he was injured and wanted medical attention. *Id.* at ¶ 9. Hedden claims he was told to get the train to the appropriate lift after notifying a trainmaster about the

Incident, but Defendants dispute whether the trainmaster in question was notified about the injury prior to telling Hedden that. [DE 62, ¶ 40.] Cardine testified generally that they finished building the train after Hedden fell, but neither he nor Hedden remember any details about what duties Hedden performed after his fall. [DE 60-11, ¶¶ 13-14.] Hedden rode the locomotive to one of the lifts where supervisors helped him off. *Id.* at ¶¶ 15-16. The day-shift trainmaster helped Cardine finish setting the train's brakes while another supervisor, Shafer, took Hedden to the emergency room for treatment. *Id.* at ¶ 17.

That same day, then-TPW mechanical manager James Meyer began inspecting the brake systems potentially involved in the Incident. *Id.* at ¶ 18. He inspected the hand brake systems of five railcars he believed could have been the one Hedden was working on that day, based on Hedden's description of the railcars he was working on. *Id.* Meyer asserts that he found the hand brake systems of all five railcars he inspected to be compliant and without mechanical defects. *Id.* at ¶ 19. Hedden disputes that Meyer actually completed a competent inspection of the hand brake systems that day based on the cursory inspection forms and lack of photographic evidence verifying the inspection's findings. *Id.* Shafer (the yard supervisor), after assisting Hedden, inspected the brake stick that was used by Hedden. Shafer received it from Hedden and found nothing out of the ordinary with the brake stick. *Id.* at ¶ 23.

## Discussion

Hedden brought four counts against Defendants.  Counts I and III claim that TPW and GW, respectively, violated the Safety Appliance Act, constituting negligence

3

*per se* under FELA by having a railcar in service equipped with an inefficient hand brake, which led to Hedden's injuries. Counts II and IV claim the defendants were negligent in their operation of the railyard and that this negligence caused Hedden's injuries. Defendants have moved for summary judgment on all counts.

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could [find] for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To determine whether a genuine issue of material fact exists, I must construe all facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Heft v. Moore*, 351 F.3d 278, 282 (7th Cir. 2003).

A party opposing a properly supported summary judgment motion may not rely merely on allegations or denials in its own pleading, and must present the court with admissible evidence supporting its arguments and rebuttals. *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010). The requirement that the evidence presented be admissible applies with the same rigor to proposed expert testimony as it does to any other evidence. *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 704 (7th Cir. 2009). This is especially important here, where Hedden's expert, John David Engle, is relied upon for many of Hedden's key assertions relating to, for example, the efficiency of the relevant appliances, the adequacy of the post-Incident inspection, and the safety

4

of Hedden's work environment. This order will analyze Defendants' motion to exclude

Engle before turning to their motion for summary judgment.

### A. Defendants' Motion to Exclude John David Engle

The admissibility of expert testimony is governed by Federal Rule of Evidence 702,

which provides that:

> A witness who is qualified as an expert by knowledge, skill, experience,
> training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help
> the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data; (c) the testimony is the
> product of reliable principles and methods; and (d) the expert has reliably
> applied the principles and methods to the facts of the case.

Under this framework, I must act as a gatekeeper for expert testimony, determining

prior to admission whether the testimony is both relevant and reliable. *U.S. v. Pansier*, 576

F.3d 726, 737 (7th Cir. 2009). In conducting this inquiry, I must focus on principles and

methodology, not on the conclusions they generate. *Winters v. Fru-Con Inc.*, 498 F.3d 734,

742 (7th Cir. 2007). The goal of this inquiry "is to assure that experts employ the same

'intellectual rigor' in their courtroom testimony as would be employed by an expert in the

relevant field." *Jenkins v. Bartlett*, 487 F.3d 482, 489 (7th Cir. 2007) (quoting *Kumho Tire Co.*
*v. Carmichael*, 526 U.S. 137, 152 (1999)).

Hedden's retained expert, Engle, worked in the railroad industry for decades. [DE

60-4, 1.] The Defendants do not challenge Engle's qualifications.  Indeed, Engle has a long

history of working in the railroad industry and testifying as an expert witness in FELA

matters. He has worked as a carman, technical instructor, training officer, and air brakes

superintendent for Norfolk Southern. *Id.* In his expert report, he reached five key opinions,

all of which Defendants challenge.

### 1. Opinion 1: The Hand Brake was Inefficient

Engle's first opinion relates to whether the hand brake was "efficient." This odd term comes directly from the Safety Appliance Act, 49 U.S.C. 20302. Under the Safety Appliance Act ("SAA"), all railroad cars need to be equipped with "efficient handbrakes." *Id.; see also Myers v. Reading Co.*, 331 U.S. 477 (1977). A hand brake is "efficient" if it is "adequate in performance; producing properly a desired effect." *Id* at 483. A hand brake is "inefficient" if it is "not producing or not capable of producing the desired effect; incapable, incompetent, inadequate." *Id.* Recall that Counts 1 and 3 of the Complaint allege a violation of the SAA. Engle claims that the hand brake "Hedden was attempting to release did not operate as intended to release and therefore could not have been efficient at the time" and that therefore the freight car "was not in compliance 49 U.S.C. 20302 [the SAA]." [DE 61-2, 9.]

As an initial matter, this ultimate opinion that the railcar was not in compliance with the SAA is a conclusion that "abridges the jury's role of applying the law to the facts" and, additionally, "usurps the judge's role of instructing the jury as to the applicable law." *Arrington v. City of Chicago*, 2022 WL 2105871 at *5 (N.D. Ill. June 10, 2022). However, this opinion has more systemic and related issues: its reliability and helpfulness.

Engle's expert report is devoid of any explanation of the methodology he used in reaching his opinion that the hand brake was inefficient. Engle did not inspect the hand brake at issue in this case. [DE 43-1, 86:23-87:13.] Moreover, he does not have a clear theory as to what made the hand brake fail to release when Hedden pulled on it with the brake

stick. Indeed, in his deposition, Hedden admitted "I don't know that I can explain exactly what it was other than the hand brake did not operate as intended, because it could have been different things[.]" *Id.* at 101:10-16. The closest he gets to a theory is his statement that there could have been a defect in some part of the hand brake caused by "wear or something[.]" *Id.* at 126:6-8. This kind of conclusory statement—devoid of any testing, research, or proper analysis—does not display the kind of rigor one would expect from expert testimony.

Not only does he lack a sufficiently reliable methodology for this opinion, but what methodology he does have reveals that his testimony would not be helpful to the jury. Engle admits that his opinion as to the "condition of the hand brake at the time of the incident" relies "solely on Mr. Hedden's description of the hand brake[.]" *Id.* at 87:9-13. But Hedden himself can explain directly to the jury what he saw, heard and did. Engle's conclusory opinion parroting Hedden's testimony is not helpful to a juror.  As stated above, Hedden stated that he cannot explain what the defect was with the hand brake "other than the hand brake did not operate as intended," but a jury does not need an expert to tell them that a hand brake should turn when it is pulled on, and they can hear that testimony directly from Hedden.

A similar opinion by Engle has been found inadmissible by another court. In *Gilreath*, Engle wished to testify that, "based on [the plaintiff's] statements to him, the hand brake did not work properly and was thus inefficient." *Gilreath v. CSX Transportation, Inc.*, 2018 WL 1003884, at *3 (E.D. Ky. Feb. 21, 2018). Like in this case, Engle had not actually inspected the hand brake in question, was unable to give a "clear answer" as to

7

what he believed the defect with the hand brake to be, and his opinion was based "entirely on [the plaintiff's] statements regarding the incident." *Id.* at *2-3. The court found that he had not employed a proper methodology for his opinion that the hand brake was inefficient and that his opinion would not be helpful.

Hedden says this case is different from *Gilreath*, but I fail to see how. [DE 61, 6.] In *Gilreath*, the plaintiff alleged that, while he was trying to tighten a hand brake, the hand brake unexpectedly released before coming to an abrupt stop again, causing the plaintiff to pop his shoulder. *Gilreath*, 2018 WL 1003884, at *1. For purposes of analyzing the methodology of Engle's hand brake opinion here, this is a distinction without a difference. The methodological similarities between Engle's opinion here and his opinion in *Gilreath* are undisturbed by the fact that *Gilreath* involved a lurch during an attempt to turn a hand brake one way, while this case concerns a handbrake failing to turn the other way.

With no analysis of the hand brake, nor a clear theory as to why it was defective and thus inefficient, Engle's opinion here boils down to "his belief that Plaintiff's account of the incident is true." *Id.* at *3. This kind of ipse dixit opinion just doesn't cut it. *C.W. ex rel. Wood v. Textron, Inc.*, 807 F.3d 827, 837 (7th Cir. 2015). Defendants' motion as it relates to Engle's Opinion #1 is granted.

### 2.  Opinion 2: TPW Failed to Inspect and Maintain the Railcars

In his second opinion, Engle asserts that TPW failed to inspect and maintain the railcars "because the freight car hand brake did not function as intended." [DE 61-2, 9.] First, there is literally no explanation or analysis in Engle's report as to how he arrived at that opinion. In other words, it is entirely conclusory. *United States v. Hall*, 93 F.3d 1337,

8

1344 (7th Cir. 1996) ("Conclusory statements without any explanation why the expert can contribute to the jury's understanding of the subject are also subject to exclusion."). He simply states that, because the hand brake did not function as intended, TPW must have been failing to inspect and maintain the railcars. There is no discussion, for example, of what would constitute proper and regular inspections or an analysis of TPW's maintenance protocol. Second, like the previous opinion, this opinion appears to be wholly based on Hedden's account of the Incident. It includes no mention or citation to any further investigation by Engle of additional sources, such as TPW's regular inspection or maintenance practices for railcars. Since his opinion here rests "solely on his acceptance of [Plaintiff's] account, the testimony amounted to nothing more than an invitation to the jury to believe his assessment of [Plaintiff's] truthfulness" and is thus inadmissible. *Id.* Third, since I have already found that he cannot testify as to whether the brake was efficient or had a defect, and this opinion builds directly on that premise, this opinion now has no admissible support and is thus itself inadmissible.

  **3. Opinion 3: The Railcar Involved in the Incident Was Not Properly Identified and Therefore Not Properly Inspected**

  Engle's third opinion is that the freight car involved in the Incident was not properly identified and therefore could not have been properly inspected. [DE 61-2, 10.] Although this is a close call, I will allow Engle's Opinion 3.  Engle primarily relies on two key data points in arriving at this opinion. The first is that Hedden and Cardine were told to move the train to the lift, which required them to finish building the train after the Incident and then moved it to its next destination, which made it difficult to figure out

which railcar was involved in the Incident. Indeed, he cites to Meyer's deposition where Meyer admitted that, because he was uncertain as to which railcar was involved, he had to narrow it down to five cars and inspect all of them. *Id.* at 8. The second is that the railcar involved in the Incident was a lighter color than any of the ones Meyer inspected. *Id.*

Defendants' attorneys questioned him on his reasoning for this opinion at his deposition, especially the latter reason about the color of the railcar. When shown photos of the inspected cars, Engle admitted that two of the five were lighter-colored hopper cars that, in fact, "matched th[e] description" given by Hedden. [DE 43-1, 70:19-71:2.] After admitting this, Engle tempered his opinion on this point, but still asserted that it is "questionable" whether the correct railcar was inspected. *Id.* at 124:2-8.

Defendants argue that Engle has applied no proper methodology here and that lay jurors are just as capable of matching Hedden's description of the railcar to the ones inspected by Meyer as Engle is. [DE 43, 13-14.] Starting with his methodology, Engle's reasoning relies on a few different sources, as well as his experience in railyard operations. Engle has experience in building and moving trains in railyards and can testify as to how this can make identifying a particular railcar difficult. While he partially walked back his second reason for this opinion, the opinion still finds support in his first reason: that the continued building and movement of the train made Meyer's identification of the correct railcar questionable.

Defeating Engle's second reason for this opinion is not dispositive of the first. In other words, the fact that two of the inspected cars were, in fact, light-colored hopper cars similar to the one Hedden testified about does not rule out the possibility that the exact

10

light-colored hopper car was not inspected due to the continued building and then movement of the train. While Defendants' attorneys have surely brought forth reasons to doubt this opinion, those reasons should be explored on cross examination. *Gayton v. McCoy*, 593 F.3d 610, 616 (7th Cir. 2010) ("Determinations on admissibility should not supplant the adversarial process; 'shaky' expert testimony may be admissible, assailable by its opponents through cross-examination.").

With regards to this opinion's helpfulness, I disagree with Defendants' characterization of the issue. This is more complicated than just seeing if a railcar Meyer looked at matches the description given by Hedden. A railcar could match the description and still be the wrong car, and Engle is qualified to explain why. A railyard is a complicated and complex environment. It will be helpful to jurors to have testimony about that environment so the jury can assess whether Defendants did in fact inspect the wrong railcar. Consider the following questions that Engle can help answer: How common are light colored hoppers like the one Hedden described? How does building a train affect the ability to find a particular railcar in a rail yard like the one in this case? What about moving the railcars? How are railcars usually identified in scenarios like this? The answers to these questions are not common knowledge, and Engle has experience that may help the jury understand the difficulties in identifying the correct railcar in this case, which is a material factual issue.

4. **Opinion 4: The Inspection of the Hand Brake was Deficient because Meyer did not use a Brake Stick on It**

Engle's fourth opinion is that the inspection of the railcar was deficient because

Meyer did not use the brake stick Hedden was using, or indeed, any brake stick, on the hand brake as part of the inspection. [DE 61-2, 10.] The reasoning goes that, since Meyer did not use a brake stick on any of the inspected hand brakes, he could not tell if the hand brakes worked as intended with the brake sticks.

Defendants allege that Engle lacks sufficient expertise specifically about brake sticks to make this opinion that a proper inspection would have used one. [DE 43, 15-16.] Specifically, they allege that Engle "has no meaningful experience in usage of brake sticks" and thus that he "is unqualified to opine about their use." *Id.* at 15. This argument misses what the relevant expertise is for this opinion.

Engle's opinion relates primarily to what constitutes a proper inspection. Engle asserts that a proper inspection would have recreated the conditions of the Incident, which, in this case, would have meant using a brake stick on the hand brake. Even if Defendants are right that Engle is not sufficiently experienced with brake stick usage specifically, that does not mean his opinion that a proper inspection would have used one to recreate the conditions of the Incident is invalid. He has sufficient expertise in railyard operations to testify as to what he believes would have constituted a proper inspection and has provided sufficiently reliable reasoning for this opinion.

### 5. Opinion 5: TPW failed to Properly Train Its Employees

Engle's last opinion is that TPW failed to properly train certain employees, including Hedden, on how to perform interchange inspections, including specifically on the hand brake and air brake systems and the associated riggings. [DE 61-2, 10.] He says that this failure to train the employees, including Hedden, contributed to the Incident. *Id.*

12

In reaching this opinion, Engle wrote in his report that he relied on various training materials and related documents. He points to documentation that Hedden and other employees allegedly received their annual air brake training, annual hazardous material training, annual transportation operating rules training, environmental training, hearing conservation training, and brake stick training all in one day. *Id.* at 9-10. He asserts that proper training on all of these topics, in his experience training railroad workers, would take at least 4-5 days. *Id.* He also asserts that Hedden was not trained frequently enough. *Id.* at 20.

Defendants assert that Engle's opinion here is essentially insisting that transportation employees like Hedden be trained on brake systems like mechanical employees and that, in any event, Hedden was not following the safety rules in the events leading up to the Incident. I will explore that latter point more in the summary judgment section of this opinion, but regardless, neither point makes this opinion inadmissible. His methodology for this opinion is not impugned by these arguments. Unlike Engle's opinion regarding the hand brake, his opinion on training "does not require Engle's physical examination of the hand brake" and Defendants' arguments do not suggest that his "*methodology* is unreliable." *Siemers v. BNSF Railway Co.*, 2018 WL 6421728, at *2 (D. Neb. Dec. 6, 2018). Instead, they focus more on his outcome, asserting that the high level of training Engle asserts is necessary is "a nonsensical proposition." [DE 43, 16.] But the court, as gatekeeper, is "primarily concerned with methodology, not conclusions." *Cooper v. Carl A. Nelson & Co.*, 211 F.3d 1008, 1021 (7th Cir. 2000).

In *Siemers*, the court found that Engle was qualified to speak about the training of

workers in a railyard, and that such testimony was "distinguishable from the instances where his testimony was excluded." *Siemers*, 2018 WL 6421728, at *2; *see also Prescott v. CSX Transp., Inc.*, 2013 WL 1338430 (S.D. Ga. Mar. 28, 2013) (denying a motion in limine to exclude Engle's opinion on a railroad's employee training and work practices); *Andrews v. BNSF Railway Co.*, 2018 WL 4701871, at *9 (S.D. Iowa Feb. 7, 2018) (finding that Engle's "conclusions regarding Defendant's training of employees are not so unsupported as to render them unreliable."). I agree. With regard to whether Hedden would have followed the training in any event, that is an issue for cross examination. *Gayton*, 593 F.3d at 616; *see also Cooper*, 211 F.3d at 1021 ("The proper method of attacking evidence that is admissible but subject to doubt is to cross-examine vigorously[.]"). This opinion is admissible.

************

To summarize: Engle is permitted to testify as to the adequacy of Defendants' training of its employees, including Hedden, as well as to the adequacy of Meyer's post-Incident inspection and the veracity of Meyer's findings. However, he may not testify as to whether or not the hand brake in question was efficient or whether Defendants failed to maintain the railcars generally.

### B. Defendants' Motion for Summary Judgment

FELA is a century-old law designed to protect railroad workers. Its plaintiff-friendly standard was borne out of the extreme danger posed to railroad workers during the turn of the last century. FELA provides, in pertinent part, that every "railroad ... shall be liable in damages to any person suffering injury while he is employed by such carrier in [interstate] commerce." 45 U.S.C. § 51. It grants compensation to railroad employees for

work-related injuries if "such injury or death [results] in whole or part from the negligence of any officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track ... or other equipment[.]" *Id.* What this means is that even a slight degree of negligence that brings about an injury to an employee can put a railroad on the hook for damages. *CSX Transp., Inc. v. McBride*, 564 U.S. 685, 698 (2011).

As discussed above, Hedden's claims fall into two categories: *per se* negligence under FELA via an SAA violation (Counts I and III), and negligence directly under FELA (Counts II and IV). I will discuss both of these categories in turn.

### 1. SAA Claim

The SAA does not create a separate right of action. Instead, it is a means by which to establish a railroad's negligence under FELA. *Crane v. Cedar Rapids & Iowa City Railway Co.,* 395 U.S. 164, 166 (1969). Essentially, the SAA creates a strict liability regime meaning that if an SAA violation is shown related to the incident in question, then the railroad is negligent as a matter of law. *McGinn v. Burlington Northen R. Co.*, 102 F.3d 295, 298 (7th Cir. 1996); *Urie v. Thompson,* 337 U.S. 163, 189 (1949).  Put another way, if equipment fails to work as required by the SAA, then there is liability that is "in no way dependent upon negligence and for the proximate results of which there is liability—a liability that cannot be escaped by proof of care or diligence." *DeBiasio v. Illinois Central RR,* 52 F3d 678, 683 (7th Cir. 1995) (citing *O'Donnell v. Elgin J & E Railway Co.,* 338 U.S. 384, 390 (1949)).

As described above, under the SAA, all railcars need to be equipped with "efficient" handbrakes. *Myers v. Reading Co.*, 331 U.S. 477 (1977). In this context, "efficient"

15

means "adequate in performance; producing properly a desired effect." *Id* at 483. In the seminal case *Myers v. Reading Co.*, the Court noted that there are two ways to show that a hand brake is inefficient: proof of a defect and proof of a "failure to function in the normal, natural, and usual manner." *Id.* Critically, for the second avenue, if there is proof that the hand brake did not function in the usual manner during the incident in question, an SAA violation has been shown even if the hand brake worked correctly "both before and after the occasion in question." *Id.* In this case, it is disputed whether the railroad's inspector properly inspected the hand brake in question. But even if it were properly inspected, under *Myers,* the fact that it worked properly for the inspector hours later would not be dispositive as to whether it worked properly for Hedden and thus would not determine whether it was an "efficient" hand brake.

Defendants argue that Hedden lacks evidence that the brake was inefficient. But this ignores Hedden's own testimony that the handbrake failed to work as intended. And indeed, testimony by an "experienced railroad man" that a hand brake did not function as intended at the time he used it is enough to create a genuine issue of material fact. *Id.* at 484. Hedden testified here that, when he pulled on the hand brake with the brake stick, it "didn't release like it should[.]" [DE 60-1, 216:15-19.] While "different conclusions might be possible," a jury hearing Hedden's testimony about "his handling of the brake, reasonably could infer from that evidence that the condition of this brake and its action were not those of an efficient hand brake." *Myers*, 331 U.S. at 484.

Nothing in *Lusher v. Norfolk Southern Railway Company*, 2014 WL 3894347 (N.D. Ind. 2014), a case relied on by Defendants, mandates a different conclusion. In *Lusher*, the court

recognized that plaintiffs suing under FELA "carry a lightened burden of proof, which makes it easier to withstand a motion for summary judgment" and that a plaintiff's "own testimony" can be evidence sufficient to withstand summary judgment. *Id.* at *2, *5. However, in that case, the court found that the plaintiff's own testimony was not enough because the plaintiff specifically stated that he was "unsure what went wrong" and his testimony was "not based on specific perceptions at the time of the incident." *Id.* at *9. I cannot say that Hedden's testimony is nearly as uncertain.

While Defendants point out that Hedden agreed that different employees may set the hand brake with different degrees of tightness, [DE 56-1 at 12], he did not say that is the reason for the Incident. Rather, he said that is why he repositioned the brake stick to take "less of a bite," which is something he asserts he was taught to do "in ground school." [DE 60-1, 217:4-23.] Additionally, Defendants argue that Hedden failed to follow the railroad's safety rules by pulling on the hand brake a second time instead of using a short, controlled hammering motion on it, and thus failed to act with due care. However, Hedden contends that that is not what he was taught to do and is "not something that he should have to do" on a hand brake "if it's working properly" and that doing so could actually "damage the brake stick." *Id.* The point is genuinely disputed, and to the extent Defendants' argument here has merit, it is an issue for the jury's consideration. *See Keane v. Northeast Illinois Commuter R.R. Corp.*, 2002 WL 1806919, at *3 (N.D. Ill. 2002) ("Metra next suggests that Keane 'was the sole and proximate cause of his alleged injury' because he tried to force the handbrake to release in violation of Metra procedures. But this argument, which is more properly characterized as a contributory negligence defense, also raises a

jury question.") (internal citations omitted).

In their reply, Defendants point to *Gilreath* again for support as to why Engle's opinions relating to the SAA claims are inadmissible, and then claim that, without Engle's opinion, Hedden "has no evidence of 'inefficiency' to support his SAA claims." [DE 64, 4.] As explained above, I agree that some of Engle's opinions relating to the SAA claims are inadmissible, but that does not mean the claim cannot proceed. Hedden's own testimony creates a genuine issue of material fact as to whether the hand brake was inefficient. *Myers*, 331 U.S. at 484; *see also Richards v. Consolidated Rail Corp.*, 330 F.3d 428, 433 (6th Cir. 2003) ("Trial judges should not rule out plaintiffs' opinions as to why appliances functioned inefficiently, where the plaintiffs' opinions are based on their experience and perceptions at the time of their accident."). Indeed, the SAA claim in *Gilreath* itself still went to trial despite Engle's testimony being excluded. *Gilreath v. CSX Transportation, Inc.*, 2018 WL 737607, at *4 (E.D. Ky Feb. 6, 2018) ("Gilreath's own opinion that the handbrake did not function efficiently is sufficient to avoid summary judgment for CSXT.").

### 2. Direct FELA Claims

Aside from the SAA claims, Hedden also brings claims for negligence directly under FELA. He claims various theories of negligence, including that the workplace was not reasonably safe, that Defendants failed to exercise ordinary care in the maintenance and inspection of the hand brakes, and that they failed to utilize safe job practices and procedures to prevent injuries. To prevail on these claims, Hedden must prove the common law elements of negligence. Defendants claim that Hedden lacks any evidence to satisfy the causation and breach elements for any theory of negligence. [DE 56-1, 16.]

As noted above, under FELA, a railroad is liable for damages to any employee who suffers injury resulting in whole or in part from the negligence of any officers, agents, or employees of the carrier. *Holbrook v. Norfolk Southern Ry. Co.*, 414 F.3d 739, 741 (7th Cir. 2005). FELA was designed to offer broad remedial relief and thus has a relaxed burden for the critical element of causation. *McBride v. CSX Transp., Inc.*, 598 F.3d 388, 403 (7th Cir. 2010). In a FELA case, causation is satisfied where the employer's negligence played any part, even the slightest, in producing the injury of death for which damages are sought." *Id.* (quoting *Rogers v. Missouri Pacific Railroad Co.,* 352 U.S. 500, 506 (1957).

Hedden has brought forth sufficient evidence through his own testimony and the surviving opinions of Engle to create genuine issues of material fact as to breach and causation for various theories of negligence. For example, whether Defendants had proper training and safety procedures and the extent to which that affected his conduct the day of the Incident is genuinely disputed through Engle's opinion on the issue and Hedden's own testimony about how he was trained. Whether the workplace was reasonably safe turns on whether the hand brake was working properly, which brings up various genuine disputes of material fact, including the condition of the hand brake and whether the way Hedden interacted with it was appropriate. Key rebutting evidence relied on by the Defendants, such as the findings of the post-injury inspection, is itself genuinely disputed, as Hedden has admissible expert testimony that calls the quality and veracity of the inspection into doubt. As Hedden has established genuine issues of fact that could, if decided in his favor, constitute negligence under the lowered FELA standard, the claim withstands summary judgment.

## Conclusion

For the reasons stated above, Defendants' motion to exclude the testimony of John David Engle [DE 43] is GRANTED as to Opinions 1 and 2 and DENIED as to Opinions 3, 4, and 5. Defendants' motion for summary judgment [DE 56] is DENIED.

**SO ORDERED**.

ENTERED:  April 10, 2026.

/s/ Philip P. Simon
PHILIP P. SIMON, JUDGE
UNITED STATES DISTRICT COURT